IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JOSHUA STEPHENSON,       :
                     :

        Petitioner,    :
                     :

     v.            :    Civil Action No. 20-443-GBW
                     :

ROBERT MAY, Warden, and   :
ATTORNEY GENERAL OF THE  :
STATE OF DELAWARE,    :
                     :

       Respondents.   :

———————————————

Joshua Stephenson.  *Pro Se* Petitioner.

Sean P. Lugg, Deputy Attorney General of the Delaware Department of Justice, Wilmington, Delaware.  Attorney for Respondents.

———————————————

## __MEMORANDUM OPINION__[1]

March 9, 2023
Wilmington, Delaware

———————————

[1]This case was re-assigned to the undersigned's docket on September 7, 2022.

Williams, District Judge:

Presently pending before the Court is Petitioner Joshua Stephenson's

Amended Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254.

(D.I. 12; D.I. 17)  The State filed an Answer in opposition, to which Petitioner

filed a Reply.  (D.I. 20; D.I. 35)  For the reasons discussed, the Court will deny the

Amended Petition.

## I.   BACKGROUND

> [O]n December 24, 2012, [Petitioner] visited the home of his sister, Ruth Ann Stephenson ("Ruth"); Ruth's six-year-old son, Myron Ashley, Jr. ("Myron Jr."); and Myron Jr.'s father, Myron Ashley, Sr. ("Ashley"). [Petitioner] had previously lived at the home, but had recently moved to his grandparents' house.  After talking with [Petitioner] for a period of time, Ruth sent Myron Jr. upstairs to take a bath.  Ruth and Ashley continued to talk with [Petitioner], and then Ruth went upstairs to help Myron Jr. with his bath. While Myron Jr. was in the bathtub, Ruth, who had worked a double shift that day, lay down for a moment and fell asleep.  She awoke when she heard two gunshots downstairs.  She ran downstairs. Myron Jr. heard a gunshot while he was in the bathtub and ran downstairs after Ruth.  Ruth saw Ashley lying on the floor in the living room, in front of the sofa. [Petitioner] was sitting on the smaller love seat. Ruth yelled at [Petitioner] "what did you do?" and grabbed at him.  He punched her in the face and quickly left the house.
>
> Officers arrested [Petitioner] several hours later in the basement of his grandparents' home. They also found a leather jacket with Ashley's blood on it, along with other clothing items that [Petitioner] had been wearing at Ruth's house that night.

> Ashley's death was caused by two gunshot wounds—one of which went through his left arm, and one of which entered and exited his right arm and then entered and exited his torso. When investigating the scene of the shooting, police officers found a gun on the loveseat and four spent shell casings and a bullet in various areas of the living room. They also found two gunshot holes in the sofa and corresponding holes in the wall behind the sofa and in the floor under the sofa. They were unable to locate those two bullets or any bullet or hole that corresponded to the fourth shell casing. The gun had [Petitioner's] DNA on it, as well as the DNA of at least two other, unidentified individuals. Ballistics testing revealed that the shell casings had been fired from the gun that was found on the loveseat. Swabs that were taken of [Petitioner's] hands after his arrest tested positive for gunshot residue.

*Stephenson v. State*, 225 A.3d 983 (Table), 2020 WL 821418, at *1 (Del. Feb. 18, 2020).

On December 25, 2012, Wilmington Police arrested Petitioner and subsequently charged him by indictment with first degree murder, possession of a firearm during the commission of a felony ("PFDCF"), possession of a firearm by a person prohibited ("PFBPP"), third degree assault, and endangering the welfare of a child. (D.I. 18-1 at Entry No. 1; D.I. 18-4 at 19-21) At Petitioner's preliminary hearing, the Superior Court ordered a formal evaluation of Petitioner's competency to stand trial. (D.I. 18-1 at Entry No. 19) On August 22, 2013, Dr. Douglass Schultz, a licensed psychologist, submitted a report following his July

2

2013 interview with Petitioner in which he concluded that Petitioner was competent to stand trial. (D.I. 18-1 at Entry No. 20; D.I. 18-12 at 14) On December 10, 2013, pursuant to trial counsel's request for a psychiatric examination of Petitioner, Dr. Susan Rushing, M.D., an assistant professor of psychiatry at the University of Pennsylvania, submitted a report to trial counsel in which she opined that Petitioner was competent to stand trial. (D.I. 18-12 at 14-15) Additionally, on January 31, 2014, the State moved for a psychiatric evaluation of Petitioner by a mental health professional, which the court granted. (D.I. 18-1 at Entry Nos. 25, 29) The State's expert, Dr. Stephen Mechanik, M.D., evaluated Petitioner and issued a report on April 22, 2014, in which he opined that Petitioner was competent to stand trial or enter a plea. (D.I. 18-12 at 15-16)

On March 20, 2014, Dr. Rushing prepared a report regarding Petitioner's mental health issues and "Defenses to Criminal Liability." (D.I. 18-14 at 83-94) On May 20, 2014, the State filed a motion to preclude Dr. Rushing's testimony relating to the use of self-defense. (D.I. 18-1 at Entry No. D.I. 32; D.I. 18-14 at 72-81) On May 21, 2014, Petitioner responded. (D.I. 18-1 at Entry No. 33; D.I. 18-14 at 104-106) On June 9, 2014, the Superior Court held a hearing on the State's motion to preclude Dr. Rushing's testimony and other motions. (D.I. 18-1 at Entry No 42; D.I. 18-14 at 107-135) On June 17, 2014, the Superior Court

3

orally granted the State's motion to preclude Dr. Rushing's testimony (D.I. 18-14 at 136-138), and on June 20, 2014, the court issued a formal opinion, ruling that it would not allow Dr. Rushing to testify about self-defense, stating:

> There is nothing in Dr. Rushing's report addressing how [Petitioner] perceived events on December 24 and therefore her testimony will not assist the trier of fact on this issue. Indeed, Dr. Rushing seemingly disavows any attempt to relate [Petitioner's] mental condition to his perception of those events – she states in her report that "[i]f [Petitioner] presents a defense of self-defense at trial, [Petitioner's] mental illness is unlikely to be relevant to such a defense."

(D.I. 18-14 at 139-150). Petitioner moved for reargument (D.I. 18-1 56), and the Superior Court ruled that, if Petitioner testified, Dr. Rushing's testimony might be allowed under 11 Del. C. § 3507 to show a prior consistent statement with Petitioner's possible self-defense testimony. (D.I. 18-14 at 190-191)

Prior to trial, Petitioner waived a jury trial on the PFBPP charge and his right to a speedy trial, and the Superior Court granted Petitioner's motion to sever the PFBPP charge. (D.I. 18-1 at Entry No. 59) The Superior Court denied Petitioner's motion to admit evidence that the victim was convicted in 2007 for possession of a firearm during the commission of a felony. (D.I. 18-1 at Entry No. 67)

Petitioner's jury trial on the non-severed charges began on January 5, 2015. (D.I. 18-1 at Entry No. 71) On January 7, 2015, trial counsel advised the Superior

4

Court that Petitioner had previously rejected the State's guilty, but mentally ill ("GBMI") plea offer to first degree murder.  (D.I. 19-3 at 30)

After the State rested, Petitioner moved for a judgment of acquittal. (D.I. 19-4 at 13-17; D.I. 18-8 at 30-34)  The Superior Court denied the motion on all charges except third degree assault, for which it reserved decision. (D.I. 18-8 at 34; D.I. 19-4 at 17)  On January 12, 2015, before the defense rested, Petitioner elected not to testify in his defense after a verbal colloquy with the Superior Court. (D.I. 18-5 at 54)  Thereafter, the Superior Court found that there was insufficient evidence of third degree assault and, at the State's request, submitted the amended charge of offensive touching with the rest of the charges to the jury.  (D.I. 18-6 at 16; D.I. 18-8 at 36)

After the jury retired for deliberations, the Superior Court, in a bench ruling, found Petitioner guilty of PFBPP.  (D.I. 18-17 at 41-42)  On January 13, 2015, the jury found Petitioner guilty of second degree murder (as a lesser included offense of first degree murder), PFDCF, and endangering the welfare of a child, and not guilty of offensive touching. (D.I. 18-1 at Entry No. 71)  Following the jury's verdict, the Superior Court ordered Petitioner to undergo a psychiatric/psychological evaluation by staff at the Delaware Psychiatric Center as part of a presentence evaluation.  (D.I. 18-1 at Entry Nos. 71, 78)  On May 1, 2015, trial counsel submitted an additional report from Dr. Rushing opining that she

believed Petitioner was competent to proceed to sentencing, and moved to have the
Superior Court find Petitioner guilty, but mentally ill.  (D.I. 18-1 at Entry No. 80)

On June 17, 2015, the Superior Court declined to consider Petitioner's
application to find him guilty, but mentally ill, because such a finding was required
to have been made by the trier of fact.  (D.I. 18-17 at 44)  The Superior Court
then sentenced Petitioner to life in prison for the murder conviction, and for the
remaining convictions, to twenty-six years suspended after twenty years for
decreasing levels of supervision. (D.I. 18-17; D.I. 18-14 at 16-20)  Petitioner
appealed.

On direct appeal, Petitioner, through counsel, argued that the Superior
Court abused its discretion when it denied his requests to present expert witness
testimony from psychiatrist Dr. Rushing and for a self-defense jury instruction.
(D.I. 18-17 at 55-65)  While the appeal was pending, Petitioner filed numerous *pro
se* motions for reduction of sentence, which the Superior Court denied on
September 22, 2015.  (D.I. 18-1 at Entry Nos. 89, 91, 92, 96)  In denying
Petitioner's first such motion, the Superior Court held that his sentence was
appropriate for all the reasons stated at sentencing and noted that: (1) Petitioner
was a dangerous individual when he did not take his medication; (2) the court had
no confidence that he would take his medications if he was released based upon his
past failures to do so; and (3) it was highly likely that [Petitioner] will kill again.

(D.I. 18-1 at Entry No. 96)  The Superior Court denied Petitioner's other sentence reduction motions as repetitive, noting that Petitioner's sentence was appropriate for the reasons stated at sentencing, and the Superior Court was aware of, and discussed, Petitioner's psychiatric problems extensively at sentencing.  (D.I. 18-1 at Entry Nos. 97-98)

Subsequently, on June 22, 2016, the Delaware Supreme Court affirmed Petitioner's convictions and sentence. *See Stephenson v. State*, 145 A.3d 7 (Table), 2016 WL 3568170 (Del. June 22, 2016).  On August 3, 2016, Petitioner filed a timely *pro se* motion for postconviction relief pursuant to Superior Court Criminal Rule 61 ("Rule 61 motion") raising nine claims and requested the appointment of postconviction counsel.  (D.I. 18-1 at Entry Nos. 118-119; D.I. 18-14 at 21-25) Postconviction counsel was appointed and filed an amended Rule 61 motion on November 9, 2017,  which raised only one of Petitioner's initial claims: trial counsel was ineffective for advising him against testifying, even after it became clear the Superior Court would not permit his expert Dr. Rushing to testify unless Petitioner testified.  (D.I. 18-1 at Entry No. 137; D.I. 18-14 at 226-250)  The Superior Court subsequently permitted Petitioner to supplement his postconviction counsel's reply brief with two *pro se* claims, which asserted that trial counsel was ineffective when she did not request a competency hearing and the court committed judicial error when it did not *sua sponte* hold a competency hearing.

7

(D.I. 18-14 at 289-290, 305-306)  On April 8, 2019, the Superior Court denied Petitioner's Rule 61 motion.  (D.I. 18-12).

Petitioner appealed.[2]  On appeal, Petitioner's postconviction counsel moved to withdraw under Delaware Supreme Court Rule 26(c) (D.I. 18-11), and Petitioner submitted one point for the Delaware Supreme Court's consideration: trial counsel was ineffective for advising Petitioner against testifying in his defense at trial. (D.I. 18-15)  The Delaware Supreme Court affirmed the Superior Court's judgment on February 18, 2020. *See generally Stephenson*, 2020 WL 821418.

On July 6, 2020, Petitioner filed a second Rule 61 motion (D.I. 18-19) and, on January 4, 2021, he filed the same Rule 61 motion with the Superior Court. *See State v. Stephenson*, 2021 WL 2211995, at *2 (Del. Super. Ct. May 28, 2021).  In the motions, Petitioner argued that he was deprived of his right to decide whether to plead GBMI. *Id.* at *4.  The Superior Court found the second (and third identical) Rule 61 motion to be time-barred. *Id.* at *5.  In addition, because

---

[2]While his appeal was pending, the Delaware Supreme Court granted Petitioner's motion to stay the appeal pending the results of a competency evaluation ordered by the Superior Court and until the Superior Court could determine whether Petitioner wanted to proceed *pro se* on appeal and remanded the case for an evidentiary hearing on those issues. (D.I. 18-17 at 67-71)  On remand, following evidence presented at a hearing that Petitioner was competent to represent himself, the Superior Court concluded that Petitioner knowingly, voluntarily, and intelligently decided that he wanted to be represented by counsel and rather than proceed *pro se* on his appeal. (D.I. 18-14 at 317-319)  Accordingly, on August 13, 2019, the Delaware Supreme Court lifted the stay and ordered postconviction counsel to continue to represent Petitioner on appeal. (D.I. 18-17 at 72-73)

Petitioner raised claims that were known to him at the time of trial and outrightly rejected a GBMI plea, the Superior Court summarily dismissed his second postconviction motion because Petitioner failed to satisfy Rule 61's pleading requirements for a successive Rule motion. *Id.* at *4-*5. In dismissing the motion, the Superior Court found that Petitioner had failed to plead that any new evidence existed that created a strong inference that he was actually innocent of the charges for which he was convicted, or that there was a new rule of law made retroactive to cases on collateral review that would render his conviction invalid. *Id.* Petitioner did not appeal.

## II.    GOVERNING LEGAL PRINCIPLES

### A. The Antiterrorism and Effective Death Penalty Act of 1996

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003). Pursuant to AEDPA, a federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Additionally, AEDPA imposes procedural requirements and standards for analyzing the merits of a habeas petition in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are

9

given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

## B. Exhaustion and Procedural Default

Absent exceptional circumstances, a federal court cannot grant habeas relief unless the petitioner has exhausted all means of available relief under state law. *See* 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-44 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971). AEDPA states in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). This exhaustion requirement, based on principles of comity, gives "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 844-45; *see Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000).

A petitioner satisfies the exhaustion requirement by demonstrating that the habeas claims were "fairly presented" to the state's highest court, either on direct

appeal or in a post-conviction proceeding, in a procedural manner permitting the court to consider the claims on their merits. *See Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005); *Castille v. Peoples,* 489 U.S. 346, 351 (1989). If the petitioner raised the issue on direct appeal in the correct procedural manner, the claim is exhausted and the petitioner does not need to raise the same issue again in a state post-conviction proceeding. *See Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir. 1997).

If a petitioner presents unexhausted habeas claims to a federal court, and further state court review of those claims is barred due to state procedural rules, the federal court will excuse the failure to exhaust and treat the claims as exhausted. *See Coleman v. Thompson*, 501 U.S. 722, 732, 750-51 (1991) (such claims "meet[] the technical requirements for exhaustion" because state remedies are no longer available); *see also Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006). Such claims, however, are procedurally defaulted. *See Coleman*, 501 U.S. at 749; *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000). Similarly, if a petitioner presents a habeas claim to the state's highest court, but that court "clearly and expressly" refuses to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted. *See Coleman*, 501 U.S. at 750; *Harris v. Reed*, 489 U.S. 255, 260-64 (1989).

Federal courts may not consider the merits of procedurally defaulted claims

11

unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *See McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir. 1999); *Coleman,* 501 U.S. at 750-51. To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, a petitioner must show that the errors during his trial created more than a possibility of prejudice; he must show that the errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Alternatively, if a petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent,"[3] then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice. *See Edwards v. Carpenter,* 529 U.S. 446, 451 (2000); *Wenger v. Frank,* 266 F.3d 218, 224 (3d Cir. 2001). The miscarriage of justice exception applies only in extraordinary cases, and actual innocence means factual innocence, not legal insufficiency. *See Bousley v. United States,* 523 U.S. 614, 623 (1998); *Murray,* 477 U.S. at 496. A petitioner establishes actual

---

[3] *Murray,* 477 U.S. at 496.

innocence by asserting "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial," showing that no reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. *See Hubbard v. Pinchak*, 378 F.3d 333, 339-40 (3d Cir. 2004).

## III.  DISCUSSION

Petitioner's timely-filed Amended Petition[4] asserts the following three Claims: (1) the Superior Court violated Petitioner's Sixth Amendment right to confrontation by not allowing him to call Dr. Rushing to testify on his behalf (D.I. 12 at 7-13; D.I. 17 at 2-7); (2) trial counsel created a conflict of interest, violated Petitioner's right to autonomy, and provided ineffective assistance during Petitioner's sentencing hearing when she asked the Superior Court to consider Petitioner as being guilty but mentally ill instead of presenting mitigating evidence ("IATC") (D.I. 12 at 14-20); and (3) trial counsel violated Petitioner's right to self-autonomy and provided ineffective assistance during Petitioner's bifurcated

---

[4]On March 28, 2020, Petitioner filed a *pro se* Petition for habeas relief. (D.I. 1)  In his AEDPA Election Form filed in January 2021, Petitioner indicated he wished to amend his Petition within thirty days. (D.I. 11)  On February 16, 2021, Petitioner filed a document titled "Opening Brief" presenting three claims for relief.  (D.I. 12)  After the State filed its Answer, Petitioner filed a document titled "Amended Petition,"  which essentially supplements the three claims asserted in the Opening Brief filed in February 2021.  (D.I. 17)  Given these circumstances, the Court construes the two documents (D.I. 12; D.I. 17) as Petitioner's Amended Petition.

PFBPP bench trial by unilaterally deciding that Petitioner would not testify

("IATC") (D.I. 12 at 21-27).

### A.  Claim One:  Superior Court Violated Petitioner's Constitutional Right To Call Witnesses By Not Permitting Dr. Rushing To Testify On His Behalf

Prior to Petitioner's trial, Dr. Rushing prepared a psychiatric report for the

defense regarding Petitioner's mental health.  (D.I. 18-14 at 83-94)  The State filed

a motion to preclude Dr. Rushing's testimony relating to the issue of self-defense.

(D.I. 18-14 at 72-81)  Trial counsel filed a response contending that the State's

motion should be denied.  (D.I. 18-14 at 104-106)  The Superior Court granted the

State's motion to exclude the testimony of Dr. Rushing after concluding that the

testimony was inadmissible under Delaware Rule of Evidence 702 and because

Petitioner had not complied with the notice requirement of Delaware Superior

Court Criminal Rule 16.  (D.I. 18-14 at 136-150)

In Claim One, Petitioner argues that the Superior Court violated his

constitutional right to call witnesses by denying his request to have psychiatrist Dr.

Rushing testify on his behalf and also unreasonably determined the facts when it

found that Dr. Rushing's testimony would not assist the trier of fact in resolving a

factual dispute.  (D.I. 12 at 8)  He contends that the Superior Court erred by not

finding that Dr. Rushing's testimony was admissible under Delaware Rule of

Evidence 702 because the testimony – when viewed in conjunction with his family

14

members' testimony – would have allowed the jury to determine a fact in issue, namely, whether Petitioner "was actively suffering a mental health crisis" at the time of the shooting.  (D.I. 12 at 9-12)

It is well-established that "[s]tate courts are the ultimate expositors of state law,"[5] and claims based on errors of state law are not cognizable on habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Therefore, to the extent Petitioner contends the Superior Court committed an evidentiary error under Delaware law by not permitting Dr. Rushing to testify at trial, he has alleged an error of state law that is not cognizable in this proceeding.  *See Keller v. Larkins*, 251 F.3d 408, 416 n. 2 (3d Cir. 2001) (holding that the admissibility of evidence is generally a question of state law which is not cognizable under habeas review).

To the extent Petitioner contends that the Superior Court violated his right to compulsory process[6] by refusing to allow Dr. Rushing to testify on his behalf, the record reveals that Petitioner did not exhaust state remedies for this argument. Although Petitioner challenged the Superior Court's refusal to permit Dr.

---

[5]*Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).
[6]When presenting Claim One, Petitioner explicitly asserts that his "right to call witnesses" was violated.  (D.I. 12 at 5)  Although the State construes Claim One as asserting a violation of Petitioner's right to confrontation (D.I. 20 at 20), the Court believes Claim One is more properly viewed as asserting a violation of Petitioner's right to compulsory process.

Rushing's testimony during his trial[7] and to the Delaware Supreme Court on direct or postconviction appeal, he did not present that challenge as a compulsory process violation. For instance, when opposing the State's motion to exclude Dr. Rushing's testimony, defense counsel argued that Dr. Rushing should be permitted to testify because her expert testimony regarding Petitioner's mental state would aid the jury in determining Petitioner's state of mind when the shooting occurred. (D.I. 18-14 at 105-106) After analyzing Dr. Rushing's report and proposed testimony under Delaware Rule of Evidence 702, and referencing Delaware Superior Court Criminal Rule 16, the Superior Court granted the State's motion to exclude Dr. Rushing's testimony. *See State v. Stephenson*, 2014 WL 2891626, at *2-5 (Del. Super. Ct. June 20, 2104).

On direct appeal, Petitioner argued that the Superior Court abused its discretion by denying his requests to present expert witness testimony from Dr. Rushing. (D.I. 18-18 at 55-65) Petitioner challenged the Superior Court's decision as being unsupported by the facts and Dr. Rushing's report, asserting, "while the Superior Court stated that Dr. Rushing's testimony was irrelevant and inadmissible because she did not specifically address his mental state on December 24, her report plainly contradicts the Superior Court's finding: '[Petitioner] was in a manic

---

[7] *See State v. Stephenson*, 2014 WL 2891626, at *3-5 (Del. Super. Ct. June 20, 2014).

state on Christmas Eve 2012.'" (D.I. 18-17 at 61)  Petitioner also argued that the

Superior Court abused its discretion in "finding that Dr. Rushing's testimony was

inadmissible as a discovery violation under Criminal Rule 16" because: (1)

contrary to the Superior Court's statement that the State lacked "fair notice that Dr.

Rushing would testify about how his mental condition affected his perception of

the events on December 24," "Dr. Rushing's report plainly states, among many

other psychiatric observations concerning his mental condition, that, '[Petitioner]

was in a manic state on Christmas Eve 2012'" (D.I. 18-17 at 61); and (2) the State

never raised or argued a discovery violation when it argued that Dr. Rushing's

testimony should be excluded (D.I. 18-17 at 61-62).  The Delaware Supreme Court

affirmed the Superior Court's decision to exclude Dr. Rushing's testimony "on the

basis of the [Superior Court's] memorandum opinion dated June 20, 2014."

*Stephenson*, 2016 WL 3568170, at *1.  In sum, this record reveals that Petitioner

did not assert, and neither the Superior Court nor the Delaware Supreme Court

perceived, any federal due process issues concerning the issue of Dr. Rushing's

testimony when Petitioner challenged the exclusion of Dr. Rushing's testimony

during his trial and on direct appeal.

Petitioner also did not raise Claim One's federal compulsory process issue in

his Rule 61 proceedings.  For instance, in his original *pro se* Rule 61 motion,

Petitioner raised nine grounds for relief, one of which was an argument that the

Superior Court erred by denying his request to present the expert testimony of Dr. Rushing to support his claim of self-defense. (D.I. 18-14 at 25) The Superior Court appointed postconviction counsel to represent Petitioner in his Rule 61 proceeding. Postconviction counsel ended up filing an amended Rule 61 motion presenting only one of Petitioner's original nine *pro se* arguments, which was not the compulsory process argument raised in Claim One of this proceeding. (D.I. 18-12 at 4-5) Petitioner also did not raise Claim One's compulsory process issue in his postconviction appeal to the Delaware Supreme Court after the denial of his first Rule 61 motion,[8] nor did he raise the argument in his second and third Rule 61 motions. (D.I. 18-19; D.I. 18-21); *see State v. Stephenson*, 2021 WL 2211995, at *4 (Del. Super. Ct. May 28, 2021).

At this juncture, any attempt by Petitioner to raise Claim One in a new Rule 61 motion would be barred as untimely under Delaware Superior Court Rule 61(i)(1) and as second or successive under Rule 61(i)(2). *See* Del. Super. Ct. Crim. R. 61(i)(1) (establishing a one-year deadline for filing Rule 61 motions); Del. Super. Ct. Crim. R. 61(i)(2) (providing that second or successive motions shall be summarily dismissed unless they meet the pleading requirements of Rule 61(d)(2)(i) or (ii)). Although Rule 61provides for an exception to its procedural bars if a Rule 61 motion "asserts a retroactively applicable right that is newly

---

[8](D.I. 18-15); *see Stephenson*, 2020 WL 821418, at *2.

18

recognized after the judgment of conviction is final," no such right is implicated in the instant Claim.  Similarly, the exceptions to the bars contained in Rule 61(i)(5) and (d)(2) do not apply to Petitioner's case, because he does not allege actual innocence, lack of jurisdiction, or that a new rule of constitutional law applies to Claim One.  Therefore, the due process argument in Claim One is procedurally defaulted, which means that the Court cannot review its merits absent a showing of either cause and prejudice or that a miscarriage of justice will result absent such review.

Petitioner attempts to establish cause for his default of the compulsory process argument in Claim One by blaming post-conviction counsel for failing to raise Claim One in his Rule 61 proceeding.  In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court held that inadequate assistance of counsel during an initial-review state collateral proceeding may establish cause for a petitioner's procedural default of a claim of ineffective assistance of trial counsel.  *Id.* at 16-17. In order to obtain relief under *Martinez*, a petitioner must demonstrate that: (1) the defaulted ineffective assistance of trial counsel claim is substantial; and (2) the post-conviction attorney in his first state collateral proceeding was ineffective under the standards established in *Strickland.  See Workman v. Sup't Albion SCI*, 915 F.3d 928, 937 (3d Cir. 2019).

19

Claim One does not allege that trial counsel provided ineffective assistance but, rather, alleges that the Superior Court violated Petitioner's right to compulsory process by excluding Dr. Rushing's testimony from his trial. Consequently, the extremely limited exception articulated in *Martinez* cannot be used to excuse Petitioner's default of Claim One.

In the absence of cause, the Court does not need to address the issue of prejudice. Nevertheless, the Court also finds that Petitioner has failed to demonstrate prejudice. It is well-established that a criminal defendant has a constitutional right to "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a 'meaningful opportunity to present a complete defense.'"); *see also Nevada v. Jackson*, 569 U.S. 505, 509 (2013). Part of this right is the ability to present witnesses favorable to the defense theory of the case. *See, e.g., Washington v. Texas*, 388 U.S. 14, 18-19 (1967). Yet, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions," such as evidentiary and procedural rules. *United States v. Scheffer*, 523 U.S. 303, 308 (1998). "[S]tate and federal rule makers have broad latitude

20

under the Constitution to establish rules excluding evidence from criminal trials,"[9]

and the Supreme Court has expressed its approval of "well-established rules of

evidence" that permit state trial judges to exclude evidence. *Holmes v. South*

*Carolina*, 547 U.S. 319, 326 (2006); *Montana v. Egelhoff*, 518 U.S. 37, 53 (1996)

("[T]he introduction of relevant evidence can be limited by the State for a 'valid'

reason."). "Such rules do not abridge an accused's right to present a defense so

long as they are not 'arbitrary' or 'disproportionate to the purposes they are

designed to serve.' " *Scheffer*, 523 U.S. at 308. A rule is "arbitrary" where it

"exclude[s] important defense evidence but ... [does] not serve any legitimate

interests." *Holmes*, 547 U.S. at 325. "[W]ell established rules of evidence permit

trial judges to exclude evidence if its probative value is outweighed by certain

other factors such as unfair prejudice, confusion of the issues, or potential to

mislead the jury." *Id.* at 326-37. "Only rarely [has the United States Supreme

Court] held that the right to present a complete defense was violated by the

exclusion of defense evidence under a state rule of evidence." *Jackson*, 569 U.S. at

509. The Supreme Court has found "the exclusion of evidence to be

unconstitutionally arbitrary or disproportionate only where it has infringed upon a

weighty interest of the accused." *Scheffer*, 523 U.S. at 308.

---

[9]*Jackson*, 569 U.S. at 509.

Here, the Superior Court ruled that Dr. Rushing could not testify under D.R.E. 702's helpfulness standard because "nothing in Dr. Rushing's report address[ed] how [Petitioner] perceived events on December 24 and therefore her testimony will not assist the trier of fact on this issue. Indeed, Dr. Rushing seemingly disavows any attempt to relate [Petitioner's] mental condition to his perception of those events – she states in her report that "[i]f [Petitioner] presents a defense of self-defense at trial, [his] mental illness is unlikely to be relevant to such a defense." *Stephenson*, 2014 WL 2891626, at *4. Given Dr. Rushing's explicit statement discounting the relevance between Petitioner's mental illness and the issue of self-defense, the Court concludes that the Superior Court did not unreasonably determine the facts when granting the State's motion, nor did the Superior Court's decision violate Petitioner's right to compulsory process.

Additionally, Petitioner has not satisfied the miscarriage of justice exception to the procedural default doctrine because he has not provided new reliable evidence of his actual innocence. Accordingly, the Court will deny the due process/confrontation clause argument in Claim One as procedurally barred.

## B. Claim Two: IATC During Sentencing

In Claim Two, Petitioner contends that trial counsel provided ineffective assistance at sentencing by not calling witnesses to offer mitigation evidence regarding his mental illness. Petitioner also asserts that trial counsel was operating

under a conflict of interest and/or violated his right to self-autonomy during

sentencing because trial counsel's pursuit of the guilty but mentally ill ("GBMI")

issue contradicted Petitioner's continued assertion of self-defense. (D.I. 17 at 8)

Specifically, Petitioner argues that, by focusing on presenting a GBMI defense

during sentencing and failing to offer mitigation evidence consisting of Dr. Selig's

report diagnosing Petitioner with "Borderline Intellectual Functioning" and

evidence of Petitioner's noncompliance with treatment, trial counsel failed to

subject the State's case to any meaningful adversarial testing. (D.I. 12 at 16-19)

Petitioner also states that trial counsel should have known that the judge could not

decide if Petitioner was GBMI once the jury returned a guilty verdict. (D.I. 12 at

14)

  The record reveals that Petitioner did not present the instant IATC argument

to the Delaware Supreme Court on direct appeal or on appeal from the denial of his

Rule 61 motions. At this point in time, any attempt by Petitioner to pursue relief

by filing a new Rule 61 motion containing this argument and appealing that

decision would be time-barred by Rule 61(1) and barred for being successive under

Rule 61(i)(2). Again, since none of the exceptions to Rule 61(i)(1) and (2)'s bars

contained in Rule 61(i)(5) and (d)(2) apply, Claim Two is procedurally defaulted.

Consequently, the Court cannot review Claim Two on the merits absent a showing

of cause and prejudice, or a miscarriage of justice.

Petitioner attempts to establish cause by relying on the *Martinez* exception to the procedural default rule and alleging that his default was caused by postconviction counsel's failure to include Claim Two in his first Rule 61 motion. This argument is unavailing. The *Martinez* exception to procedural default applies only where the petitioner demonstrates ineffective assistance by postconviction counsel, and that the underlying IATC claim is "substantial." To satisfy the first *Martinez* requirement, a petitioner must only show that postconviction counsel's performance was deficient under the first prong of the *Strickland* standard, *i.e.*, "that his state postconviction counsel's performance fell below an objective standard of reasonableness." *Workman*, 915 F.3d at 941.

To satisfy the second *Martinez* requirement (that the underlying IATC claim is substantial), a petitioner must show the claim has "some merit" under the standard applicable to certificates of appealability. *See Gaines v. Sup't Benner Township, SCI,* 33 F.4th 705, 711 (3d Cir. 2022). In other words, "a petitioner must 'show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.'" *Workman*, 915 F.3d at 938 (*quoting Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)). "This is a light burden; [a petitioner] must show only that his claim represents something more than the absence of frivolity or the existence of mere good faith." *Gaines*, 33

24

F.4th at 711 (3d Cir. 2022).  When making the threshold "some merit/substantiality" determination, the Court must "remain[ ] mindful that the 'substantiality' inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." *Preston v. Sup't Graterford SCI*, 902 F.3d 365, 377 (3d Cir. 2018) (cleaned up); *see also Bey v. Sup't Greene SCI*, 856 F.3d 230, 238 (3d Cir. 2017) ("[W]hether [an ineffective assistance of counsel] claim is substantial is a threshold inquiry that does not require full consideration of the factual or legal bases adduced in support of the claims.") (cleaned up).

## 1. Ineffective assistance of postconviction counsel

It is axiomatic that the *Martinez* rule cannot be utilized to excuse the default of an IATC claim unless the default was due to postconviction counsel's failure to present the claim in the petitioner's initial-review state collateral proceeding.  *See Martinez, 566 U.S. at* 16-17.  Here, although Petitioner was represented by counsel in his first Rule 61 proceeding who filed an amended Rule 61 motion asserting one ground for relief, Petitioner sought,[10] and was permitted, an opportunity to present two additional *pro se* grounds for relief.[11]  (D.I. 18-12 at 12-13; D.I. 18-14 at 276,

---

[10]Petitioner could have sought permission to present Claim Two's IATC argument in his Rule 61 motion at the same time he sought to present the other two claims for relief.

[11]Petitioner asserted two *pro se* claims on postconviction appeal: (1) trial counsel was ineffective for not requesting a competency hearing  and (2) the Superior

284-86, 289-90, 303-308, 315-16)  The grounds for relief that Petitioner asserted in

his Rule 61 appeal after postconviction counsel moved to withdraw from

representing Petitioner under Delaware Supreme Court Rule 26(c) did not present

the IATC argument in Claim Two.[12]  *See Stephenson*, 2020 WL 821418, at *2.

In short, since Petitioner could have, but did not, present Claim Two in his

initial collateral proceeding and on post-conviction appeal, he cannot utilize

*Martinez* as a method of avoiding his default of Claim Two.

### 2.  Claim Two is not a substantial IATC claim

Petitioner also cannot rely on *Martinez* to avoid his procedural because

Claim Two's IATC argument is not substantial.  At sentencing, the State argued

that Petitioner should be sentenced to life for second degree murder because of his

violent criminal history (two prior felony assaults), repetitive criminal conduct,

lack of remorse, accountability or amenability to lesser sanctions, and undue

depreciation of the offense.  (D.I. 19-8 at 5-7)  Trial counsel argued that Petitioner

was diagnosed as bipolar and schizophrenic at the age of ten, his mother was

schizophrenic and his grandparents, who took over his care, were unable to

properly care for him.  (D.I. 19-8 at 20)  Trial counsel emphasized that Petitioner

---

Court committed judicial error by not *sua sponte* holding a competency hearing.
(D.I. 18-12 at 12-13; D.I. 18-14 at 276, 284-86, 289-90, 303-308, 315-16)
[12]The sole ground Petitioner presented for the Delaware Supreme Court's
consideration was an IATC claim alleging that trial counsel was ineffective for
advising him against testifying in his defense at trial.  (*See* D.I. 18-15)

loved his sister and her son and he was sorry because they now must live without the victim. (D.I. 19-8 at 21-22)  Trial counsel mentioned that Petitioner was taking Risperdol and Depakote, psychotropic medications, and that while incarcerated, he was under psychiatric care. (D.I. 19-8 at 22)  Trial counsel stated that Petitioner believed that the victim could have killed him because the victim was a drug dealer, had a violent history, and Petitioner had seen him with guns. (D.I. 19-8 at 23)  Petitioner also dealt drugs for the victim, but had not paid the victim the money he owed him at the time of the victim's death, which was what he and the victim were discussing that night. (D.I. 19-8 at 24-25)  Trial counsel added that, for more than a year, she and Petitioner extensively discussed the subject of Petitioner testifying, and she eventually advised him not to testify because his assault history and version of events where he admitted selling drugs would be placed before the jury. (D.I. 19-8 at 24-25)

During the sentencing hearing, trial counsel admitted that she could not find any legal support for asking the Superior Court to consider GBMI at sentencing, but she asked for the GBMI designation hoping that Petitioner would obtain mental health treatment, which she doubted he would receive in prison. (D.I. 19-8 at 26, 29-32)  Counsel added that Petitioner's mental illness issues – paranoid, schizophrenic, and bipolar – did not preclude a finding that he acted in self-defense. (D.I. 19-8 at 26-27)  Counsel stated that due to his learning disability,

27

Petitioner presented with a child-like affect and that when he is on medication, Peterson was "very docile, eager to please." (D.I. 19-8 at 34-35)  Trial counsel asked the court "to please consider that there has been a mental health history and to put that in context," sentence Petitioner to thirty years, and order that he be provided with mental health treatment.  Counsel further acknowledged that Petitioner did not want to be found GBMI because someday he wanted "to go to Gander Hill or a similar facility." (D.I. 19-8 at 28, 38-40)

Petitioner told the Superior Court that he was sorry for what he put his family through, but he killed the victim in self-defense.  (D.I. 19-8 at 40-41) Petitioner said that the Bible teaches forgiveness, he prayed for everyone, and he missed the victim too.  (D.I. 19-8 at 41-42)  Petitioner then stated that he would not want to replace his attorney even though they did not always see "eye-to-eye," explaining that he knew that she was doing the best she could for him.  (D.I. 19-8 at 42-44) Petitioner only complained that he had not received all of his Rule 16 discovery, which trial counsel denied stating they had sent it to him at least three times.  (D.I. 19-8 at 42-44)

The Superior Court then stated to trial counsel, "I have throughout the course of this litigation, observed your zeal, and your efforts on behalf of your client, and I have been very impressed by them; and I have zero doubt that you have done anything other than your best, and that you have provided your client

28

with all of the materials that you have received, and I'm confident about that."

(D.I. 19-8 at 44)

Prior to imposing sentence, the Superior Court explained:

> I have reviewed the – the psychiatric – well, I've reviewed the entire file thoroughly, but in particular, I have placed a lot of emphasis on the psychiatric reports here, and in – I find that all of them are helpful, but one I wanted to focus on for a moment was the report prepared by [Petitioner's] psychologist, Dr. Rushing.
>
> Dr. Rushing said that, and I agree with this – that "when [Petitioner discontinues his medications, his symptoms, including psychosis and mania, increase in severity. When psychotic or manic, he has been documented to react in a physically violent manner on multiple occasions."
>
> What worries me is that I see little, if any, prospect that [Petitioner] will ever be reliable to take medications and to avoid that. Dr. Rushing, for example, noted that – and this is particularly chilling – that [Petitioner] does not believe he is ill. [Petitioner] has, in Dr. Rushing's view, very little insight into his mental illness.
>
> There have been documented times, according to Dr. Rushing and according to the file, that when not incarcerated or not under the care of DPC, [Petitioner] has previously discontinued his medications. In fact, shortly before these events, apparently his sister had thought that [Petitioner] had discontinued his medications.
>
> I looked through the file, and I saw an administrative warrant dated August 11th of 2011,

29

in which there was a violation of probation, and the events describing that warrant were not, by themselves, particularly chilling, until you consider how violent a man he becomes when he – when he doesn't take medications.

For example, [Petitioner] – and this is in 2010 – missed appointments for community mental health on September 28th, October 12th, and November 19th, even though he had been ordered to make those appointments by the Mental Health Court.

*            *            *

He had positive urine screens for Marijuana, and again, there was a history not reported – in this particular administrative warrant, but there's a documented history that he – he simply did not take his medications except when forced to do so. In fact, there are reports in the file that at times, he has been forced to, by prison authorities, to take his medications, because he won't voluntarily do so when asked by prison authorities.

His history, criminal history, shows an escalating level of violence. In 2000, there are arrests for Terroristic Threatening and menacing, fighting, Assault in the Third Degree. In 2004, there was an arrest for threatening a victim, and then another one for Possession with intent to Deliver Within 300 feet of a Park. That, by itself, I don't think shows a propensity for violence, but then again in 2005, there was a Terroristic Threatening.

In 2007, there was a Terroristic Threatening. In 2007, an Assault in a Detention Facility. There was an assault on a correctional officer.

In 2008, there was a stalking with threats, as well as Terroristic Threats, and yet again, in 2010, there

30

was another Assault in a Detention Facility on a State Officer.

When you look at this record, you see the sort of level of violence, coupled with the mental illness that he seems to suffer, coupled with his refusal to take medications. It seems almost inevitably that a tragedy such as this was going to occur. It's sad beyond belief that it occurred but the signs were, frankly, all there.

I am sympathetic and I understand that [Petitioner] suffers from a disease that he didn't ask to have, but I am also convinced that he has chosen not to take his medications which he knows are necessary to prevent him from harming others, and I have seen little, if any, likelihood that he will ever voluntarily take those medications. I think, for the rest of his life, that [Petitioner] will be a threat to whoever he is around, unless he is taking medications, and I see little – there is no indication, if any, of the extensive records that I've read, that [Petitioner] could be relied upon to take medications if he were unsupervised; and there is no indication whatsoever that there is any possibility, let alone likelihood, that in the future he will develop the ability to take medications and that some day in the future he may be relied upon to take his medications.

I am steadfastly against punishing an individual because of a disease. I don't think I am punishing [Petitioner] because he has a disease, because I am satisfied that he had the ability to control this and chose not to do so.

There comes a point in time when I must protect society and others, and when that interest becomes paramount, and this is one of those, because I am

31

> convinced [Petitioner] will pose a threat to some
> innocent person the minute he gets out of custody;
> and I see, as I say, little likelihood or little
> possibility that he will change in the future.

(D.I. 19-8 at 45-51)

Petitioner contends that trial counsel was ineffective for failing to present Dr. Selig's report at sentencing because it diagnosed him as having "borderline intellectual function" ("BIF") and would have helped demonstrate that he did not have the ability to be compliant with his medication regimen. (D.I. 12 at 17-18) He argues that his failure to routinely take his medication in the past was due to the combined effect of BIF and schizophrenia and not, as he asserts the Superior Court believed, because he chose not to be compliant. (D.I. 12 at 17-18)

"*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case." *Wiggins*, 539 U.S. at 533. *Strickland* only requires a reasonable investigation.

The foregoing excerpt from Petitioner's sentencing hearing demonstrates that the Superior Court extensively considered the psychiatric reports contained in Petitioner's record when determining his sentence and, although the Superior Court only explicitly referenced Dr. Rushing's report, Petitioner has not demonstrated

32

that Dr. Selig's report was not one of the other psychiatric reports considered by the court. Additionally, Dr. Rushing's report refers to Dr. Selig's 2006 and 2010 diagnosis of Petitioner as having "borderline intellectual function," and also explains that BIF "is a diagnosis that indicates an IQ in the range of 70-85." (D.I. 13 at 5- 29) Finally, contrary to Petitioner's assertion, the Superior Court's consideration of Petitioner's noncompliance in taking his medication was not so much focused on whether Petitioner willfully chose not to take his medication but, rather, on the fact that Petitioner was more compliant with his medication regimen when supervised. For instance, the Superior Court explained that "there is no indication, if any, of the extensive records that I've read, that [Petitioner] could be relied upon to take medications if he were unsupervised." (D.I. 19-8 at 51) Given these circumstances, the Court cannot conclude that trial counsel's failure to independently highlight Dr. Selig's BIF diagnosis prejudiced Petitioner.

To the extent Petitioner contends trial counsel was ineffective for failing to call witnesses at sentencing, Petitioner does not identify the witnesses he believes should have been called, the testimony they would have provided, or that the witnesses would have been available to testify. To the extent the mental health experts who authored the aforementioned psychiatric reports are the potential witnesses to which Petitioner refers, Petitioner has not identified the testimony they would have provided or how their testimony would have added to the

33

diagnoses presented in their reports.  Consequently, for all these reasons, the Court

concludes that the IATC allegation in Claim Two lacks "some merit."

And finally, Petitioner's argument that trial counsel represented him while

operating under a conflict of interest and/or violated Petitioner's right to self-

autonomy by presenting the GBMI issue during sentencing against Petitioner's

wishes does not transform Claim Two into a substantial ineffective assistance of

counsel claim.  A Sixth Amendment conflict of interest claim is treated as a special

type of ineffective assistance of counsel claim, because prejudice will be presumed

if the attorney actively represented conflicted interests that adversely affected

his/her performance.  *See Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980).  To prevail

on an ineffective assistance of counsel claim based on a conflict of interest, a

petitioner "must establish that an actual conflict of interest adversely affected his

lawyer's performance."  *Id.*  An actual conflict of interest arises when "trial

counsel's interests and the defendants' interests diverge[ ] with respect to a material

factual or legal issue or to a course of action."  *Government of Virgin Islands v.

Zepp*, 748 F.2d 125, 135 (3d Cir. 1984).  As explained by the Third Circuit, an

"actual conflict" arising from defense counsel's active representation of conflicting

interests is established by showing (1) some plausible alternative defense strategy

might have been pursued, and (2) the alternative defense was inherently in conflict

with or not undertaken due to the attorney's other loyalties or interests.  *See United*

34

*States v. Morelli*, 169 F.3d 798, 810 (3d Cir. 1999). "[T]he conflict must cause some lapse in representation contrary to the defendant's interests ... [which] can be demonstrated not only by what the attorney does, but by what he refrains from doing." *Mickens v. Taylor*, 535 U.S. 162, 173 (2002). However, courts must keep in mind the principle that "defense counsel is in the best position to determine if a conflict exists." *Id.* at 167–68. In this case, if trial counsel and Petitioner disagreed about presenting the GBMI issue during sentencing – which is not indicated in the sentencing transcript – that disagreement over legal strategy does not amount to an actual conflict of interest under the Sixth Amendment.

Nor did trial counsel's presentation of the GBMI issue during sentencing deprive Petitioner of his right to self-autonomy. In *McCoy v. Louisiana*, 138 S. Ct 1500 (2018), the Supreme Court held that criminal defendants "must be allowed to make [their] own choices about the proper way to protect [their] liberty," which includes the right to "insist on maintaining innocence at the guilt phase." *Id.* at 1508. When counsel does not allow a defendant to maintain his innocence, the defendant's Sixth Amendment rights are violated. *Id.* Importantly, in this case, trial counsel did not present a GBMI defense against Petitioner's wishes at trial. Instead, trial counsel maintained Petitioner's innocence and presented a theory of self-defense. (*See* D.I. 18-14 at 107-108) At sentencing, *after* Petitioner had been found guilty, trial counsel made a strategic decision to present the GBMI issue in

35

an attempt to ensure that Petitioner would receive the appropriate mental health treatment during incarceration.

For all these reasons, the Court finds that Petitioner has failed to demonstrate that Claim Two asserts a substantial claim of ineffective assistance. The absence of cause obviates the need to address the issue of prejudice. Additionally, the miscarriage of justice exception is inapplicable because Petitioner has not asserted new reliable evidence of his actual innocence.

Accordingly, the Court will deny Claim Two as procedurally barred.

## C. Claim Three: IATC During Bifurcated Bench Trial For PFBPP

In Claim Three, Petitioner asserts that trial counsel provided ineffective assistance during his bifurcated bench trial for PFBPP and deprived Petitioner of his right to self-autonomy by waiving Petitioner's right to testify. (D.I. 12 at 21, 23) Petitioner did not present Claim Three to the Superior Court in any of his Rule 61 motions or to the Delaware Supreme Court on direct appeal or on postconviction appeal from the denial of any of Petitioner's Rule 61 motions. For the same reasons discussed with respect to Claim Two, Petitioner is unable to pursue further review of Claim Three in the Delaware state courts, which means that Claim Three is procedurally defaulted. *See supra* at Section II.B.

Petitioner also unsuccessfully invokes the *Martinez* rule to establish cause for his default of Claim Three. First, the fact that Petitioner could have, but did

36

not, present Claim Three in his supplement to postconviction counsel's reply brief in his initial Rule 61 proceeding and in his post-conviction appeal from that proceeding precludes him from utilizing *Martinez* as a method of avoiding his default of Claim Three. Second, Petitioner has failed to demonstrate that the underlying IATC argument in Claim Three is substantial. On June 24, 2014, Petitioner signed a stipulated waiver of jury trial in which he confirmed his understanding of the rights he was waiving in electing a bench trial on the bifurcated PFBPP charge. (D.I. 18-2 at Entry No. 2) On January 12, 2015, Petitioner voluntarily waived his right to testify at trial on the murder and related charges. (D.I. 19-6 at 27-29) That same day (January 12, 2015), after the jury retired for deliberations in the murder trial, the bifurcated PFBPP case proceeded to a stipulated bench trial. (D.I. 19-6 at 35) When the bench trial began, trial counsel only conceded that Petitioner had a prior felony conviction that made him a person prohibited. (D.I. 19-6 at 35) The State submitted a certified copy of Petitioner's prior felony assault conviction and then both the State and trial counsel incorporated by reference the attorneys' statements and evidence as they were submitted to the jury in the murder trial. (D.I. 19-6 at 35-36) The Superior Court found beyond a reasonable doubt that Petitioner was guilty of PFBPP because he possessed a firearm when he shot Ashley. (D.I. 19-6 at 36)

37

Petitioner acknowledges that he knowingly decided to not testify in his related murder trial and that he agreed to a bifurcated bench trial for his PFBPP charge. Importantly, Petitioner signed the stipulation for a bench trial in order to eliminate the need for live testimony. (D.I. 19-6 at 36) Aside from the stipulation that Petitioner was a person prohibited, the sole issue before the Superior Court in the subsequent bifurcated PFBPP trial was whether Petitioner possessed the firearm and shot Ashley. Yet, as trial counsel admitted during her opening statement in the murder trial, the murder trial testimony showed that Petitioner possessed a firearm and shot Ashley. (D.I. 19-1 at 14-15)

Here, Petitioner makes the unsupported argument that trial counsel unilaterally decided that he would not testify in the bifurcated bench trial. Petitioner has not alleged that he requested to testify in his bench trial and, importantly, the Court notes that the bifurcated bench trial immediately followed the jury trial on the related murder charge, where Petitioner, in a colloquy, stated he did not wish to testify. Petitioner also has not alleged what he would have presented to the Superior Court through his testimony that would have led to an acquittal on the PFBPP charge. Consequently, the Court cannot conclude that trial counsel performed deficiently or that Petitioner was prejudiced by trial counsel's failure to challenge the State's case or request that the Superior Court engage in a separate colloquy regarding Petitioner's decision whether to testify at the

38

bifurcated bench trial.  Given these circumstances, the Court finds that Petitioner's

procedurally defaulted IATC argument in Claim Three is not substantial and,

therefore, does not constitute cause for his default.

In the absence of cause, the Court will not address the issue of prejudice.

Additionally, the miscarriage of justice exception does not apply in this case.

Accordingly, the Court will deny Claim Three as procedurally barred.

**D. Pending Motions**

Petitioner filed the following Motions during the pendency of this case:  (1)

Motion for § 2253 Appeal (D.I. 39); (2) Motion to Appoint Counsel (D.I. 40); and

(3) Amended Motion for an Evidentiary Hearing (D.I. 45).  The Court construes

the Motion for § 2253 Appeal to be a Motion to Supplement the Petition because it

essentially reasserts and/or supplements the three Claims for relief presented in his

Petition.  So construed, the Court will grant the Motion.  (D.I. 39)  The Court

further notes that it has considered the supplemental information when reviewing

and deciding to deny the instant Petition.

In turn, given the Court's determination that the three Claims in the Petition

do not warrant relief, the Court will dismiss as moot Petitioner's Motion to

Appoint Counsel (D.I. 40) and his Amended Motion for an Evidentiary Hearing

(D.I. 45).

## IV. CERTIFICATE OF APPEALABILITY

A district court issuing a final order denying a § 2254 petition must also decide whether to issue a certificate of appealability. *See* 3d Cir. L.A.R. 22.2 (2011); 28 U.S.C. § 2253(c)(2). A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In addition, when a district court denies a habeas petition on procedural grounds without reaching the underlying constitutional claims, the court is not required to issue a certificate of appealability unless the petitioner demonstrates that jurists of reason would find it debatable: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court has concluded that the instant Petition does not warrant relief. Reasonable jurists would not find this conclusion to be debatable. Accordingly, the Court will not issue a certificate of appealability.

## V.  CONCLUSION

For the reasons discussed, the Court concludes that the instant Petition must be denied without an evidentiary hearing or the issuance of a certificate of appealability.  An appropriate Order will be entered.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JOSHUA STEPHENSON,  :
         :
   Petitioner,  :
         :
  v.      :  Civil Action No. 20-443-GBW
         :
ROBERT MAY, Warden, and :
ATTORNEY GENERAL OF THE :
STATE OF DELAWARE,  :
         :
Respondents.   :

---

## O R D E R

At Wilmington, this 9ᵗʰ day of March, 2023, for the reasons set forth

in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1. Petitioner Joshua Stephenson's Amended Petition for a Writ of

Habeas Corpus Pursuant to 28 U.S.C. § 2254 (D.I. 12; D.I. 17) is **DISMISSED**,

and the relief requested therein is **DENIED**.

2. Petitioner's Motion for § 2253 Appeal (D.I. 39), which is

construed to be a Motion to Supplement, is **GRANTED**. The Court notes that it

considered the supplemental information when reviewing and denying the instant

Petition.

3.  Petitioner's Motion to Appoint Counsel (D.I. 40) and Amended

Motion for an Evidentiary Hearing (D.I. 45) are **DISMISSED** as moot.

4.  The Court declines to issue a certificate of appealability because

Petitioner has failed to satisfy the standards set forth in 28 U.S.C. § 2253(c)(2).


_____
United States District Judge

2